UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN COURTHOUSE

| | |
|---|---|
| Juan Velez, individually and on behalf of all others similarly situated, | 1:22-cv-08581-JLR |
| Plaintiff, | |
| - against - | First Amended Class Action Complaint |
| Lasko Products, LLC, | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. Lasko Products, LLC ("Defendant") manufactures, markets, and sells low profile portable space heaters it describes on its packaging and in website copy provided to third-party sellers such as Amazon.com and Home Depot as having an "Automatic Temperature [feature which] controls room temperature" and an "Easy-to-read digital display [that] allows you to control the warm air to your comfort level" ("Product").



I.   FAULTY TEMPERATURE CONTROL

2. This feature relies on a temperature control panel and thermostat inside of the device to ensure the temperature matches what the user sets.



3. However, due to defective design and manufacture of the temperature control board, including the internal thermostat, the device is capable and does consistently overheat the area.

4. Defendant's manuals indicate that when the temperature is set, the heater will turn on when the room temperature reaches one degree below the set temperature, and shut off when two degrees above the set temperature.

5. However, a significant percentage of the devices will regularly exceed the set temperature.

6. For example, if the temperature is set to 72 degrees, a common occurrence is for the temperature control panel to disregard this setting and keep rising, above 80 and 90 degrees.

7. Numerous users have documented their experiences with the flawed temperature controls through online forums and customer reviews during the past several years.

8. One purchaser wrote that "Before I knew it the room would be 87 degrees, when I had set it to 70 [degrees]."

9. Another commented that, "I went into my toddler's room to wake her up in the morning and found it was near 100 degrees in her room! I tested the unit out downstairs and sure enough even with the set temperature at 80 degrees it would just keep on running."

10. A customer "put a temperature gauge next to [the unit] and it wasn't very accurate so it was very difficult to figure out where to set the temperature so it'd come on at night."

11. One user wrote, "The heater won't turn off. If I leave it on, the room temp[erature] goes up to 85-90 degrees! Worked at first but something is off with its system board."

12. While the temperature control initially was stable following the purchase of the unit, a purchaser wrote that "[N]ow the unit no longer shuts itself off, but keeps getting hotter, no matter what the temperature was programmed at."

13. To the extent portable space heaters and any incorporated temperature-regulating thermostat are subject to certain voluntary standards, these are only intended to prevent malfunction which could result in risk of a fire, and not hyperthermia, where the body's temperature rises above normal levels.

14. For example, the standards specify that safety or temperature-limiting controls, designed to prevent unsafe operation of a heater, shall interrupt power to a sufficient number of heating elements to reduce temperature as not to exceed 347° F, intended to prevent the risk of fire.

15. Depending on the degree of malfunction, a room in which a heater is located could sustain temperatures exceeding 100° F (38° C), which is unsafe.

16. If an individual is exposed to above-normal temperatures for an extended period of time, they could suffer hyperthermia.

17. The Consumer Products Safety Commission ("CPSC") has identified numerous hyperthermia deaths from room heaters.

18. This poses a greater risk to young children, people with disabilities and senior citizens, who may be less capable of recognizing and correcting the conditions.

19. To the extent the device contains heat sensors that monitor a room's temperature to prevent room temperatures from reaching an unsafe level, these elements are defective and fail to adequately and consistently function under normal use conditions.

20. The temperature control failures suffer from defects including but not limited to lack of adequate calibration which can lead to sustained elevated temperatures.

## II. PREMATURE SHUT OFF FAILURE

21. Related to the Product's defective temperature control system is its high failure rate where the unit will shut off prematurely after several minutes plugged in.

22. The cause of this behavior is likely due to the circuitry design and sensors in the temperature control unit.

23. One customer wrote:

> The failure mode is that it turns itself off after two minutes of being plugged in, regardless of any reset or thermostat setting.
>
> Then you have to unplug it; you plug it back in and get another 2 minutes of heating before it turns itself off. These are not intermittent faults-- they are absolutely repeatable every time. I have purchased five of these over the last few years. I thought perhaps it was an issue of it drawing too much electricity since two were in the same room. runs for about ten minutes and then shuts off.

24. Another purchaser attributed these issues to a defective thermal overload protector, writing that:

> After about 3 minutes it clicked, the display went blank except for a red light at the bottom of the display. I pressed the power button. No response. Unplugged it and waited 5 minutes or so. Plugged it in and the power button worked again. After 3 minutes it shut off again.

## III. CUSTOMER SUPPORT AND WARRANTY ISSUES

25. The Product defects are compounded by Defendant's failure to adequately address customer concerns which include not honoring the promised three year manufacturer warranty.

26. For example, Defendant's customer service fails to timely respond to calls and emails

from customers.

27. When customers reach support by phone, they are placed on long holds for up to thirty minutes, and get disconnected from the call.

28. When customers connect with support personnel, they are asked for proofs of purchase in order to receive service and coverage under the warranty.

29. Where customers are unable to prove that they purchased the units within three years, Defendant fails to honor the warranty.

30. Defendant describes its warranty as "limited" and that it warrants against defects in workmanship and/or materials.

31. Defendant defines the warranty's duration as applying to only the original purchaser for three years from the date of original purchase or until the original purchaser sells or transfers the product, whichever first occurs.

32. This type of warranty leads the consumer to believe that proof of purchase is not needed so long as he or she owns the product and seeks coverage within three years.

33. Defendant's attempt to impose a duty to furnish documentary proof on purchasers is not reasonable given this description.

34. The burden to prove that the purchasers are not the original purchasers and that they have possessed the Product for longer than three years is on Defendant.

IV. **CONCLUSION**

35. Plaintiff paid more for the Product than he otherwise would have had he known of the above-described defects, as would not have bought it or would have paid less.

36. The Product is sold for a price premium compared to other similar products, no less than $79.99, a higher price than it would otherwise be sold for, absent the misleading

5

representations and omissions.

## Jurisdiction and Venue

37. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

38. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

39. Plaintiff Juan Velez is a citizen of New York.

40. Defendant Lasko Products, LLC is a Pennsylvania limited liability company with a principal place of business in West Chester, Pennsylvania, Chester County.

41. According to the Nevada Secretary of State, Defendant's managing members are residents of Pennsylvania.

42. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

43. The members of the class Plaintiff seeks to represent are more than 100, because the Product is available from warehouse club stores, big box stores, home improvement stores, hardware stores, general retailers and online, in the States covered by Plaintiff's proposed classes.

44. Venue is in this District, and this action should be assigned to the Manhattan Courthouse, because Plaintiff resides in this District in Bronx County, which is where he purchased the Product, and it was in this County where he experienced (1) its faulty temperature controls such that the heater would not turn off, rising far above the programmed temperature, preventing him from utilizing its automatic temperature control, (2) the Product's repeated premature shut off after it was plugged in for only several minutes, regardless of performing any reset or thermostat setting and (3) Defendant's failure to adequately address his issues including not honoring the

promised three year warranty, in part by not responding timely to customer inquiries and placing obstacles to receiving the relief advertised under the warranty, by being placed on hold during telephone calls for upwards of thirty minutes, eventually resulting in calls getting disconnected from Defendant's end, and being asked for proof of purchase to receive service and coverage under the warranty even though this condition was not reasonable under the circumstances, because the burden to prove that Plaintiff was not the original purchaser of his unit and that he possessed it for longer than three years was on Defendant.

## Parties

45. Plaintiff Juan Velez is a citizen of Bronx, New York, Bronx County.

46. Defendant Lasko Products, LLC is a Pennsylvania limited liability company with a principal place of business in West Chester, Pennsylvania, Chester County.

47. Defendant is a leading seller of fans, heaters, air purifiers, and humidifiers.

48. Plaintiff bought the Product at Home Depot, 2560 Bruckner Blvd, Bronx, NY 10465, in spring 2022.

49. Plaintiff relied on Defendant's promise of automatic temperature control, on the box and on websites displaying Defendant's advertising copy, and bought the Product because he expected it would adjust the ambient temperature to the temperature set on the device and would not prematurely fail within months of use under normal conditions.

50. While the Product functioned adequately for a short period of time following Plaintiff's purchase, this did not last long.

51. Within several months, when Plaintiff turned his unit on and attempted to use its automatic temperature control, the device would keep generating heat far above the programmed temperature.

52. This meant Plaintiff could not use the Product for its purpose, which was to elevate slightly the heat of the area it was placed in, not significantly, such as by ten to fifteen degrees, which caused those areas to become overheated and possibly cause hyperthermia.

53. Following the period where the Product's automatic temperature control failed to function, Plaintiff's unit would repeatedly and prematurely shut off after being plugged in for only several minutes.

54. Plaintiff tried to reset the device, by unplugging it, waiting approximately five minutes, and plugging it into different locations in the designated areas, thinking there was a problem with the outlet he was using.

55. However, these steps failed to have any effect, because when he plugged in the device to different outlets, it would work for several minutes then turn itself off with a light sounding "click" noise which appeared to be a faulty automatic shutoff sensor.

56. Plaintiff initially sought Defendant's assistance in repairing and/or replacing the Product.

57. However, he was stymied by its cumbersome and burdensome warranty process and failure to attend to the needs of customers.

58. This included being placed on hold for upwards of half an hour, being disconnected from phone calls, and being asked for proof of purchase even though most people, including Plaintiff, do not retain the large, long box the Product was sold in for several months, which is when the above-described issues typically begin to manifest.

59. Plaintiff bought the Product at or exceeding the above-referenced price.

60. Plaintiff chose between Defendant's Product and other similar products which were represented similarly, but which did not misrepresent their attributes and/or lower-priced products

which did not make the claims made by Defendant.

## Class Allegations

61. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Alabama, Idaho, Montana, Alaska, West Virginia, Georgia, South Carolina, Tennessee, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

62. Common questions of issues, law and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

63. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

64. Plaintiff is an adequate representative because his interests do not conflict with other members.

65. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

66. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

67. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## New York General Business Law §§ 349 and 350

68. Plaintiff incorporates by reference all preceding paragraphs.

69. Plaintiff did not expect (1) the Product's automatic temperature control would not work, (2) leaving it on would create a risk of overheating, (3) it would prematurely fail within several months by "clicking" off after a few minutes of being plugged in, and (4) that when he experienced these issues, Defendant would not seek to constructively not honor its warranty, through methods which included making it difficult to impossible for customers like him to submit their claims, like long hold times whereby callers were disconnected and did not receive calls back and imposing the incorrect burden of proof with respect to the length of his ownership of the Product and that he was its first owner.

70. Defendant's sale of the Product given these issues was misleading to customers like Plaintiff who did not expect such defects nor the failure to honor its warranty.

Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)

71. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

72. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

73. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

74. The Product was manufactured, labeled, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that (1) the Product's automatic temperature

control would work, (2) leaving it on would not create a risk of overheating, (3) it would not prematurely fail under by "clicking" off after a few minutes of being plugged in, and (4) that when he experienced these issues, Defendant would honor its warranty.

75. However, (1) the Product's automatic temperature control did not work, (2) such that leaving it on would create a risk of overheating, (3) it prematurely failed by "clicking" off after a few minutes of being plugged in, and (4) that when customers like Plaintiff he experienced these issues, Defendant's actions constructively denied his warranty claims through methods which included making it difficult to impossible for customers like him to submit their claims, like long hold times whereby callers were disconnected and did not receive calls back and imposing the incorrect burden of proof with respect to length of his ownership of the Product and whether he was its first owner.

76. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions, and targeted digital advertising.

77. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires, including its automatic temperature control, and that it would function adequately for a normal period of usage following its sale.

78. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant (1) the Product's automatic temperature control would work, (2) leaving it on would not create a risk of overheating, (3) it would not prematurely fail by "clicking" off after a few minutes of being plugged in, and (4) that when he experienced these issues, Defendant would honor its warranty.

79. Defendant's representations affirmed and promised that (1) the Product's automatic temperature control would work, (2) leaving it on would not create a risk of overheating, (3) it would not prematurely fail by "clicking" off after a few minutes of being plugged in, and (4) that when he experienced these issues, Defendant would honor its warranty.

80. Defendant described the Product so Plaintiff and consumers believed (1) the Product's automatic temperature control would work, (2) leaving it on would not create a risk of overheating, (3) it would not prematurely fail by "clicking" off after a few minutes of being plugged in, and (4) that when he experienced these issues, Defendant would honor its warranty, which became part of the basis of the bargain that it would conform to its affirmations and promises.

81. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

82. This duty is based on Defendant's outsized role in the market for portable space heaters, the leading Lasko brand.

83. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

84. Plaintiff provides, provided, or will provide notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's express and implied warranties.

85. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

86. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

87. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging and in advertising, because (1) the Product's automatic temperature control did not work, (2) leaving it on created a risk of overheating, (3) it prematurely failed by "clicking" off after a few minutes of being plugged in, and (4) that when he experienced these issues, Defendant constructively denied his attempts at coverage under its warranties.

88. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected (1) the Product's automatic temperature control would work, (2) leaving it on would not create a risk of overheating, (3) it would not prematurely fail by "clicking" off after a few minutes of being plugged in, and (4) that when he experienced these issues, Defendant would honor its warranty, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

89. Plaintiff would not have purchased the Product or paid as much if these true facts had been known, suffering damages.

<u>Fraud</u>

90. Defendant misrepresented and/or omitted attributes and qualities of the Product, that its (1) automatic temperature control would work, (2) leaving it on would not create a risk of overheating, (3) it would not prematurely fail by "clicking" off after a few minutes of being plugged in, and (4) that when he experienced these issues, Defendant would honor its warranty.

91. Defendant had knowledge of these issues for several years, due to issues with the circuit boards in its automatic temperature control units, based on use of lower quality and lower cost parts and defective circuit board design.

Unjust Enrichment

92. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages, statutory and/or punitive damages, and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   February 27, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com